DUGAN, J.
¶1 Allan Edward Skodowski, Jr. appeals that portion of the divorce judgment requiring that he pay maintenance to Gloria Skodowski. He also appeals the order denying his motion for reconsideration or, in the alternative, for a new trial.
¶2 The trial court awarded indefinite maintenance to Gloria in a monthly amount based on Allan's likely annual income and forty-five percent of any annual income exceeding Allan's likely annual income, payable within ten days of Allan's filing his state and federal tax returns or April 15, whichever occurs sooner. Allan asserts that the trial court erred in its maintenance award because (1) it imputed the income that he received from his former employer in 2016 to him as his current income and (2) it did not consider the support and fairness objectives in making the maintenance award. We disagree and, therefore, affirm.
BACKGROUND
¶3 Gloria and Allan were married in 1984 and have three children. Neither Gloria nor Allan completed high school. Both worked full-time consistently during the marriage. In addition, Gloria was the primary caretaker for their three children, who are now adults.
¶4 In June 2015, Gloria filed this divorce action. In March 2017, the parties filed a stipulation that Gloria's base income was $ 49,595 and Allan's base income for 2016 was $ 184,500.
¶5 Gloria's claim for maintenance was tried to the court over three days, beginning on March 28, 2017, and ending on September 8, 2017.[1] As the trial progressed, the adverse effect of Gloria's chronic obstructive pulmonary disease (COPD) on her ability to work increased and Allan's employment situation changed.
¶6 Gloria worked for the same company for twenty-seven years. She started working as a cleaning lady and eventually progressed to the accounts receivable manager. As of March 28, 2017, her COPD required a breathing treatment that added two to two and one-half hours to her daily morning pre-work routine. Gloria's full-time work schedule had been modified because as the day continued, her breathing got worse. Sometimes she required a second breathing treatment at home. She went to work for six hours and, typically, because of her breathing problems left her desk only when necessary. She returned to her home exhausted. She was working ten hours of her forty-hour week at home. Allan does not dispute Gloria's health problems. She did not receive bonuses from her employer and there was no foreseeable opportunity for Gloria to advance at the company.
¶7 Allan worked for Transwestern Commercial Services from 1999 until June 30, 2017. Beginning in 2009, Allan had been Transwestern's managing senior vice president and its national director of sustainability receiving annual bonuses of $ 16,000 to $ 25,000, in addition to his salary. As noted, in 2016, Allan's base salary was $ 184,500.
¶8 In February 2017, Transwestern informed Allan that it intended to wind down the sustainability division and offered him several options. Allan concluded that the most advantageous option was to purchase Rivion LLC, his former division, for $ 10. Allan became the sole member of Rivion, and as of July 1, 2017, Rivion acquired Allan's Transwestern division's contracts, liabilities, location, and its personnel. Rivion had accounts receivable of $ 1,166,453 for the first six months of 2017. Rivion was paying its eleven employees the same salaries that Transwestern had paid them. Allan also testified that he had two open positions to fill for Rivion.
¶9 During the trial, Allan introduced evidence regarding his possible income from Rivion. That evidence provided a possible income range from $ 82,000 to $ 372,000. For Rivion's first six months of operation, Allan testified that he expected to earn a net income of $ 98,000 or $ 82,300. Allan also agreed that based on his projected income of $ 82,300 for the first six months, his annual income from Rivion would be $ 164,600, assuming no other contracts came in. Allan also stated he hoped to earn about $ 120,000 or maybe $ 125,000 per year. Allan also testified that he was estimating a monthly draw of $ 5000 and Rivion would retain $ 5000 each month to pay his taxes.
¶10 Allan also introduced the testimony of Dorothy Schwarz, Rivion's chief operating officer (COO).[2] She testified that Rivion was paying her a base salary of $ 132,000, plus benefits. Schwarz prepared a budget for Rivion that included a salary for Allan of $ 125,000 for the first year. She also stated that after paying salaries to the staff and Allan, and paying expenses, Rivion would have a net operating income of over $ 97,000 for the six months between July 1 and December 31, 2017. Rivion's budget did not have any kind of reserve.
¶11 Allan also called an expert, Helena Schmidt, an accountant with Rivion's outside accounting firm. She estimated that Allan's income for the second half of 2017 would be $ 258,000. She indicated that Allan's tax liability would be based on $ 372,000 of estimated income, which included $ 114,000 in taxable wages paid by Transwestern. Schmidt's numbers were based on the financial data and projections provided by Allan and Rivion's employees. Allan had paid federal and state quarterly estimated tax payments in accordance with the $ 372,000 estimated amount.
¶12 On September 8, 2017, the final day of the trial, Gloria testified that she was on short-term disability and would be paid the full amount of her salary for a total of thirteen weeks. After that time, if she was unable to work, she would be on long-term disability and would be paid sixty percent of her salary. The trial court found that she could also apply for social security disability benefits, which would potentially result in a gross monthly income of $ 3843.95, rather than the $ 4132.92 per month to which she had stipulated. The trial court ordered the parties to file proposed findings of fact, conclusions of law, and judgment regarding maintenance.
¶13 On October 13, 2017, the trial court rendered an oral ruling finding that the credible evidence supported a determination that "Allan's annual income and earning capacity" was $ 184,500, as Allan had previously stipulated. The trial court stated that it had reviewed Gloria's proposed findings of fact line by line and concluded that they correctly set forth the credible evidence relating to the statutory factors for maintenance. The trial court adopted her proposed findings, conclusions of law, and judgment, and ordered Allan to pay indefinite maintenance of $ 4784 per month to Gloria, plus forty-five percent of any annual income exceeding Allan's likely annual income, payable within ten days of Allan's filing his state and federal tax returns or April 15, whichever occurred sooner. The trial court also expressly maintained jurisdiction to revise maintenance based on a change of circumstances.
¶14 The trial court also noted that a well-reputed expert retained by Allan was present during the trial but did not testify. Therefore, the trial court concluded that Gloria's evidence and arguments regarding maintenance were "solid and sustainable"; otherwise the expert would have been called to refute them.
¶15 At the time of the divorce judgment, Gloria and Allan were fifty-three and fifty-two years old, respectively. Gloria was in poor health and her physical condition was declining. Allan had back pain and was in "questionable health." They had been married for thirty-two years. Gloria's total monthly expenses were $ 5161, and her budget was largely the same as it had been during the last three years of marriage and during the pendency of the divorce. The trial court filed its findings of fact, conclusions of law, and judgment of divorce on October 25, 2017.
¶16 Allan filed a motion for reconsideration or, in the alternative, for a new trial. Gloria filed a motion to dismiss Allan's motion and requested that Allan be ordered to pay actual attorney fees and costs incurred in responding to his motion. Construing Gloria's motion as a response, the trial court adopted her arguments and legal authorities for the purposes of its ruling and concluded that Allan failed to establish good cause for the relief sought. The trial court denied the parties' motions.
¶17 This appeal followed.
DISCUSSION
¶18 Allan argues that the trial court erred in its maintenance award because it imputed the income that he received from his former employer as being his current income. He further asserts that the trial court did not consider the support and fairness objectives in making the maintenance award.
I. Standard of review and applicable law
Standard of review for maintenance determinations
¶19 In a divorce action, "it is within the [trial] court's discretion to determine the amount and duration of maintenance." McReath v. McReath , 2011 WI 66, ¶43, 335 Wis. 2d 643, 800 N.W.2d 399. We will not disturb that determination on review unless there has been an erroneous exercise of discretion. See King v. King , 224 Wis. 2d 235, 248, 590 N.W.2d 480 (1999). We will also uphold the trial court's findings of fact unless they are clearly erroneous. See Young v. Young , 124 Wis. 2d 306, 310, 369 N.W.2d 178 (Ct. App. 1985).
¶20 A trial court erroneously exercises its discretion by failing to consider the relevant factors, basing its award on factual errors, making an error of law, or granting an excessive or inadequate award. Rohde-Giovanni v. Baumgart , 2004 WI 27, ¶18, 269 Wis. 2d 598, 676 N.W.2d 452. "[A] discretionary determination must be the product of a rational mental process by which the facts of record and law relied upon are stated and are considered together for the purpose of achieving a reasoned and reasonable determination." Hartung v. Hartung , 102 Wis. 2d 58, 66, 306 N.W.2d 16 (1981). We will uphold a trial court's discretionary decision as long as the court "examined the relevant facts, applied a proper standard of law, and, using a demonstrated rational process, reached a conclusion that a reasonable judge could reach."See Long v. Long , 196 Wis. 2d 691, 695, 539 N.W.2d 462 (Ct. App. 1995).
Applicable law for maintenance determinations
¶21 A maintenance decision must begin with the list of the ten factors in WIS. STAT. § 767.56 (2017-18).[3] LaRocque v. LaRocque , 139 Wis. 2d 23, 31-32, 406 N.W.2d 736 (1987). The Wisconsin Supreme Court has instructed trial courts to start with " 'the proposition that the dependent partner may be entitled to [fifty] percent of the total earnings of both parties' and then make any needed adjustments after considering the ... § 767.56 factors." McReath , 335 Wis. 2d 643, ¶45 (citation omitted). The trial court exercises its discretion in determining the weight of each of those factors. See Schmitt v. Schmitt , 2001 WI App 78, ¶18, 242 Wis. 2d 565, 626 N.W.2d 14.
¶22 An award of maintenance has two objectives. The first objective is support of the payee spouse. McReath , 335 Wis. 2d 643, ¶44. "[M]aintenance should support the payee spouse at the pre-divorce standard," which "should be measured by 'the lifestyle that the parties enjoyed in the years immediately before the divorce and could anticipate enjoying if they were to stay married.' " Id. (citation omitted). The second objective is fairness, which aims to "compensate the recipient spouse for contributions made to the marriage, give effect to the parties' financial arrangements, or prevent unjust enrichment of either party." Id. (citation omitted).
¶23 The marital standard of living which a trial court seeks to preserve is a case by case individual determination. Hubert v. Hubert , 159 Wis. 2d 803, 819, 465 N.W.2d 252 (Ct. App. 1990). "The court may consider a party's earning capacity rather than actual earnings when determining a party's obligation for maintenance ... and the earning capacity of the party seeking maintenance is a factor to consider in awarding maintenance[.]" Finley v. Finley , 2002 WI App 144, ¶12, 256 Wis. 2d 508, 648 N.W.2d 536.
II. The trial court properly determined Allan's annual income
¶24 Allan argues that the trial court improperly imputed income to him because it based its maintenance award on his 2016 income from his former employer, rather than on his actual income from Rivion in 2017. Allan also asserts that the trial court erroneously imputed income to him "without making any finding that [he] was shirking, i.e. , that his decision to seek new employment with a reduced income was either voluntary or unreasonable under the circumstances," citing Chen v. Warner , 2005 WI 55, ¶20, 280 Wis. 2d 344, 695 N.W.2d 758. However, Chen is not applicable to this case. It addressed the issue of whether a parent was "shirking" her child support obligation when she discontinued full-time employment in order to become "an at-home full-time child care provider." See id. , ¶¶1, 4.
¶25 Allan's shirking argument is misplaced. This case is not a shirking case. Rather, it is an uncertain income case. There was no evidence or argument that Allan had voluntarily left his position with Transwestern. As stated by the trial court, "[Allan's] future income is unpredictable and will vary."
¶26 Allan asserts that the trial court attributed his 2016 income from Transwestern in determining his 2017 income and ignored evidence that he was only drawing $ 5000 per month for living expenses. However, the record establishes that the trial court considered the evidence provided by Allan and his witnesses regarding the range of income Allan could reasonably expect to earn. Based on that evidence, the trial court determined Allan's earning capacity.
¶27 "Where the trial court acts as the fact finder, as it did in this case ... the trial court is the 'ultimate arbiter of the credibility of the witnesses.' " See Young , 124 Wis. 2d at 311-12 (citation omitted). The trial court found Schmidt's testimony to be credible and accurate for purposes of Allan's income. It found that Allan has an earning capacity of $ 31,000 per month, which equals $ 372,000 annually. It also found that Rivion is substantially the same business as Allan's former employment and, therefore, "he has the ability to earn a base salary of $ 184,000 ... and will likely have additional income based upon the profitability of this business."
¶28 In its oral decision, the trial court acknowledged that the "linchpin" of the maintenance issue was determining the amount of income it should attribute to Allan and that it had "wrestled" with the facts of the case for "quite some time." The trial court highlighted the evidence showing that Allan's 2017 income was $ 372,000, as testified to by Schmidt, noting that Allan had argued that the amount should be reduced by the $ 114,000 that Transwestern had paid him during the first six months of 2017, which would reduce his annual income to $ 258,000. Allan had also asserted that his annual income would be $ 120,000.
¶29 In determining the proper level of income and earning capacity to attribute to Allan, the trial court considered that Allan purchased Rivion for $ 10 and that all its employees, including its COO whose salary was $ 132,000, continued to earn the same amount that they had earned with Transwestern. The trial court stated that it "defied common sense" to conclude that Allan, Rivion's sole owner and manager, would make less than the COO of the company. However, the trial court explicitly stated that it had considered all the evidence in the case when it determined that Allan's annual income and earning capacity were $ 184,500. We note that the $ 184,500 amount that the trial court determined Allan would earn is lower than the $ 258,000 which Allan advanced as his prospective 2017 income. The record does not support Allan's assertion that the trial court attributed to him his 2016 income from Transwestern in determining his income for 2017.
¶30 Allan also asserts that the trial court erred because it did not determine whether there was a valid business reason to retain earnings in a business or whether they are a pretext to manipulate income to avoid support obligations. Allan argues that only after these two conditions are satisfied can the court consider retained earnings when calculating the payer's gross income, citing Weis v. Weis , 215 Wis. 2d 135, 141-42, 572 N.W.2d 123 (Ct. App. 1997).[4]
¶31 Weis involved the interpretation of former WIS. ADMIN. CODE § HSS 80.02(13)(g), now WIS. ADMIN. CODE § DCF 150.02(16), applicable to determining whether undistributed partnership profits should be included in the calculation of a payer's child support obligation. See Weis , 215 Wis. 2d at 141-44. Allan cites no legal authority requiring a trial court to apply the administrative code provision for calculating income for the purposes of determining child support to a determination of maintenance. "Arguments unsupported by references to legal authority will not be considered." State v. Pettit , 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992). Therefore, we decline to further consider the argument. We also note that the trial court could reasonably rely on evidence from Schwarz that Rivion had no reserve funds.
¶32 We conclude that the record establishes that the trial court's determination as to Allan's earning capacity is the product of a rational mental process "by which the facts of record and law relied upon [were] stated and considered together for the purpose of achieving a reasoned and reasonable determination." See Hartung , 102 Wis. 2d at 66. Therefore, we may not disturb the trial court's finding as to Allan's earning capacity.
III. The trial court properly exercised its discretion in setting the amount of maintenance
¶33 Allan argues that the trial court did not consider the support and fairness objectives of a maintenance award. Specifically, he argues that the trial court did not consider either party's living expenses and needs or Allan's ability to pay the maintenance award.
¶34 Gloria points out that a portion of Allan's argument about the amount of maintenance relies on the contentions and factual proffers in his motion for reconsideration, which were not before the trial court when it made its maintenance decision and were rejected by the trial court as untimely. She asserts that those submissions should not be considered on appeal. Allan's reply brief does not address this contention and, therefore, we deem it to be conceded. See United Co-op. v. Frontier FS Co-op. , 2007 WI App 197, ¶39, 304 Wis. 2d 750, 738 N.W.2d 578 (stating that the failure to refute a proposition asserted in a response brief may be taken as a concession). Thus, we will limit our consideration of this issue to the record before the trial court when it issued its divorce findings of fact, conclusions of law, and judgment.[5]
¶35 Allan's assertion that the trial court did not consider the support and fairness objectives of a maintenance award is not borne out by the record. The trial court's written findings addressed all of the statutory factors set forth in WIS. STAT. § 767.56, noting with respect to Allan that his income was "sufficient to meet the expenses of both parties at a standard of living reasonably comparable to that enjoyed during the marriage if he continues to receive the income that he has typically earned and is currently projected to earn." The trial court also found that considering the allocation of assets and debts between the parties, pursuant to the partial marital settlement agreement, it was unlikely that either of the parties would be able to retire any time in the foreseeable future and, therefore, both parties would rely on Allan's earnings, as they did during the marriage.
¶36 In its oral decision, the trial court also expressly recited the dual objectives of maintenance, stating,
Maintenance is to be awarded based on a review of the factors set forth in Wisconsin Statute [§] 767.56, which are aimed at furthering the support objective, to support the recipient spouse in accordance with the needs and earning capacities of the parties, and the fairness objective, to ensure a fair and equitable financial arrangement between the parties in each individual case....
Regarding the support objective, maintenance is designed to maintain a party at an appropriate standard of living, under the facts and circumstances of the individual case, until the party exercising reasonable diligence has reached a level of income where maintenance is no longer necessary.
¶37 Contrary to Allan's argument, the trial court also addressed Gloria's needs stating that her income was "the best it is going to get" and that given "her substantial health problems she has no means to improve her future earning capacity." The trial court further stated that she had been fortunate to have a "benevolent employer." It also noted that she had endured the trial with an oxygen tank continuously providing her with oxygen.
¶38 Allan argues that the trial court's minimum maintenance award of $ 4784 per month, when combined with Gloria's income, exceeded her monthly living expenses by more than $ 2500 per month, and that the trial court provided no explanation for that determination. However, we note that "support is not the sole objective of maintenance" and in the interest of the fairness objective, the trial court may set maintenance at a level which exceeds the payee's budget. See Hefty v. Hefty , 172 Wis. 2d 124, 135-36, 493 N.W.2d 33 (1992). Furthermore, in its oral decision, the trial court explained its reasoning noting that the support objective is not fulfilled when the payee is not living at a standard "reasonably comparable to that enjoyed during the marriage and the payor is."
¶39 Additionally, the trial court noted that in setting maintenance it was not limited to salary, but included cash equivalents and benefits accruing from any source. Further, the trial court noted that it was required to take particular care to be realistic about Gloria's future earning capacity and to not relieve Allan of a support obligation lest Gloria become the obligation of the taxpayers. As noted at the time of the trial, Gloria was receiving short-term disability payments that would last thirteen weeks. Thereafter, if she was unable to work, she would receive long-term disability payments in the amount of sixty percent of her salary. At the same time, the trial court acknowledged that a reasonably comparable standard of living must be accomplished without unreasonable hardship to the supporting party-Allan. Moreover, the trial court expressly retained jurisdiction to revise maintenance based on a change in circumstances.
¶40 The record establishes that the trial court considered the factors relevant to a maintenance determination. While Allan disagrees with the weight that the trial court afforded to those factors, we conclude that the record establishes that the trial court's determination as to the amount of maintenance that Allan is to pay to Gloria is "the product of a rational mental process by which the facts of record and law relied upon [were] stated and [were] considered together for the purpose of achieving a reasoned and reasonable determination." See Hartung , 102 Wis. 2d at 66.
CONCLUSION
¶41 We conclude the trial court properly ordered Allan to pay indefinite maintenance to Gloria by determining Allan's earning capacity and that it considered the support and fairness objectives in making the maintenance award. Therefore, we affirm.
By the Court. -Judgment and order affirmed.
Not recommended for publication in the official reports.

When the trial began other issues were included, but those were resolved by the parties' partial settlement agreement filed on July 10, 2017, and the trial court's July 21, 2017 order approving that agreement.

We note that the record contains two spellings of the COO's surname. We use the spelling "Schwarz" provided by Allan's amended supplemental witness list.
Schwarz did not testify at the trial. Instead, the transcript of Schwarz's August 11, 2017 deposition was admitted into evidence as trial exhibit no. 14 and is included in the record.

All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

In support of his arguments, Allan also cites Lendman v. Lendman , 157 Wis. 2d 606, 612-16, 460 N.W.2d 781 (Ct. App. 1990). In Lendman , we concluded that when a trial court finds that a sole shareholder of a corporation has artificially reduced his or her income to avoid a maintenance obligation, the trial court may take the corporation's retained earnings into account when setting maintenance. See id. Unlike Lendman , retained earnings were not an issue in this case; Allan's earning capacity was the issue.

We also note that Allan's notice of appeal includes the denial of his motion for reconsideration. However, his appellate briefs do not address the denial of that motion. Therefore, Allan is deemed to have abandoned the issue. See A.O. Smith Corp. v. Allstate Ins. Cos. , 222 Wis. 2d 475, 491, 588 N.W.2d 285 (Ct. App. 1998).